Case No. 15-1452 et al. NRG Power Marketing, LLC et al. Petitioners v. Federal Energy Regulatory Commission Mr. Sheppard for the Petitioners, Ms. Banta for the Respondent, and Mr. Flynn for the Intervenor Mr. Sheppard for the Respondent, and Mr. Flynn for the Intervenor Good morning, and may it please the Court. Good morning. In its orders below, FERC destroyed an overwhelmingly supported stakeholder compromise by directing PJM to make a so-called compliance filing that imposed the opposite of what PJM actually filed. The order is reflected by three fundamental errors, each of which independently warrants reversal. First, FERC failed to comply with the statutory scheme of using its role under FPA Section 205 and depriving market participants of their right to notice and comment a rate that was completely different from the one FERC imposed. Second, FERC substituted hopelessly circular reasoning for any analysis of the evidence, which was almost uniformly ignored. And third, FERC never analyzed, or even pretended to analyze, the cumulative impact of piling one exemption upon another, including those they were meant to replace. Indeed, there was no substantial evidence supporting that patchwork frankenstein that FERC imposed, because it was the opposite of what PJM did. It's not particularly the first, but it's the all. If PJM consented to what FERC did, do you have a case from there on? Yes, Your Honor. We do. All right. FERC and PJM will tell us that none of the decisions of this court in Winfield, et cetera, matter, because PJM has gone full imperial with respect to its relationship to the other market participants, deciding that it's the only entity that really matters for decision-making purposes here. City of Winfield, the very case they're turning to for the acquiescence exemption, presaged exactly the situation. And what does it say? And I would direct you to 744-F-2nd-876. We have a very wholesome paragraph in the court explaining that there are other valid concerns, and that the acquiescence to a materially different rate can only be stretched up to the point where it begins to violate the notice-and-comment values that 205 imposes by way of a decision. And the court emphasizes in its citation of Portland Cement versus Ruckelhaus that it's critically important that you get the opportunity to notice-and-comment before it makes its decision, not scrambling for 30 days after FERC issues its decision to try to address the problem on rehearing. Well, nobody got rehearing at that point, right? Or saw a rehearing. Well, yes, of course, their rehearing was sought in Winfield, or it wouldn't have been able to make it. No, no, in this case. We sought a rehearing. Indeed, we sought a rehearing, Your Honor. Did you appeal from the denial? Did we appeal from that? Petition this court from the denial? Rehearing? Yes, sir. That's the sole reason that we're here. When did you file this rehearing that we're talking about now? When was it filed? June 2013, Your Honor. Yes, we just celebrated the four-year anniversary. And how long ago was the order from which you're asking a rehearing? The order was four years ago. The rehearing order was somewhat more recent. Speed J.M. did not seek a rehearing. No, Your Honor. Speed J.M. did not seek a rehearing, and it did not make a compliance filing. I think it is fair that everyone— It made a compliance filing. Say again? It made a compliance filing. Of course it did. It was directed to. I think everyone, including Speed J.M., interpreted this as a 206 command to file exactly what Burke called the command. Now, several years later, we have a rehearing order that attempts in paragraphs 22 and 23 to clarify what it is that Burke actually meant to do and say, no, you had options. Actually, we didn't make you do this. You really could have. You could have resisted our command. But isn't it true that they didn't make them do that? They simply said, we will approve the order, and the order may have been conditioned upon your changing two things in it. So they didn't order them. So as far as you can tell from the record, it could have gone on with the prior rate if they did nothing, right? Yes, if they did not file a compliance filing, it would have left us exactly where we want to be, and where we want to be is a reversal of Burke's orders so that we can be restored to our original bargaining position, which has been destroyed by Burke's orders, and move forward with a comprehensive fix to all the problems with these exemptions in light of not only the errors identified in this case, but also the many number of other things that have happened since then. Judge Brown and yourself, just for example, sat through the capacity performance case on Valentine's Day, I believe it was. So it's clear that there are a lot of issues that need to be dealt with. But we are not going to be able to move forward with a comprehensive solution that stakeholders can support unless we go back to a bargaining position. And we can't do that without getting these orders reversed. We think we're entitled to win under the 205 receipt, because until I hear your question to be focusing very much on the question of acquiescence, I'll make it easier for you. I don't contest acquiescence. No one contests acquiescence. PGM has, as I said, gone full imperil and said, we're the only people who make a difference here. So I'm encouraging you to go back, read City of Winfield at page 876, look at the middle paragraph on that page, which forecasts exactly this situation. Acquiescence is not enough if the rate change is so dramatic that no one really had the opportunity to have notice and comment on the rate that was ultimately proposed. Here, it's the opposite of what was proposed. So this is the perfect case for application of the very question that was reserved in Winfield. I'd like to move on now to the statutory point. I'll let you. I'll let you. You're fine. Thanks. I don't see a lot more questions on that. I'm not reading the bench to need more discussion of the statutory point.  because there are so many strange mistakes in FERC's orders. I'd like to break it up into unit-specific exemption, the categorical exemptions, and then look at the total effect third. So the petitioners and several others come into PGM and explain, and PGM itself, come in to explain, the unit-specific review is a complete failure, it's opaque, and it's allowing in units that are coming in well, well, well below cost. FERC's answer to that evidence in that general line of argument is a stunning non-sequitur, and it merits reading what FERC said. It required PGM to keep the unit-specific exemption because it found the unit-specific review, quote, yields benefits that warrant its retention. Now, that's actually irrelevant in a 205 case because the imputative reasonableness of an old rate has no bearing on whether that could be replaced in a 205. But what is the specific benefit that they identify? Because it, quote, allows resources into the market that likely would not have qualified for either of PGM's proposed exemptions. This is not a straight answer to our question. Our claim is unit-specific exemption is broken, it's allowing in below-cost resources. Their answer is, no, we need to have the ability to let in those resources, leaving out the sort of below-cost piece of that entire puzzle. That's not a straight answer to our question. There's no doubt these people came in with a low cost. A third problem I'll get to. But next on this justification point, what is FERC's second rationale for finding that these units must have been economic? This is the answer we get, and for a place to look for this, FERC's brief at 32. FERC argues that the New Jersey and Maryland resources must be economic because they pass unit-specific review. That is akin to arguing that steroid screening works because no one's been caught. That is not an answer to our question. We're saying your system is broken. Their answer is, no, our system's not broken because it's not catching anyone. So this is why it's a third problem that FERC just ignored the numbers. What did we show? By the way, based on not information we could get from PGM, but on information we had to glean from discovery and decisions in preemption cases, proceeding entirely parallel to this one, FERC never explains how units using a mature technology, because important, this is gas-fired technology, there's nothing special about the units they allowed in, were allowed to come in at 41% or 53% of the net cost of new entry, which is supposed to be the cost that people are coming in. Neither FERC nor anyone cites evidence to show that these generators, who are charging as little as 41% of net cone, could even break even, much less that they were in the market. So, unless there are further questions about the gigantic flaws in the unit's civic review defense that FERC put on, I'd like to move on to categorical exemptions. Didn't they say that eliminating that would force some generators to bid at an artificially high price? Say again? Didn't they say that eliminating that would force some generators to bid at an artificially high price? Eliminating that would force some generators to bid at an artificially high price? That... I mean, you may disagree with that, but they... I think what you mean to get at is not that it would force them to bid at an artificially high price, but there were allegations that net cone was set too high. It's sort of getting at the same place, but it's different. This isn't a case about... There are plenty of people who think that net cone limit needs to be adjusted, some down, some up. But it's really not a square answer to... To answer, these guys are coming in way below net cone, which is the standard you said is the right standard, to then say, well, some people think that the standard is wrong. Okay, fix the standard, but that's not before you in this case. We're supposed to be thinking that the standard that you've set here is actually the right standard. And if people are deviating from it, then we can go fix that in a different 205 case, which is about a different subject. Not this one. It's not... It's, again, not a straight answer. Have I answered your question, Judge Kavanaugh? Thank you. All right, moving to the categorical exemptions. And it shouldn't be any surprise that there are unexplained inconsistencies that pervade Burke's defense here. Self-supply. NRG, in particular, came in with very strong evidence that the net short and net long limits that PJM had proposed were far too generous and that anyone could satisfy them. PJM reached a different conclusion. Burke decided to defer to PJM, but Burke didn't explain why. Again, we're not... There's no quarrel about whether or not Burke deferred to PJM's analysis, but... And that's fine. They can pick between experts, but they are still obligated to explain why. And that's a particularly glaring problem here because Mr. Stoddard, the NRG expert, gave a point-by-point rebuttal of everything in PJM's evidence, and PJM itself gave no response. So it's not even clear what Burke could defer to. It's saying, we agree with PJM, but PJM didn't explain what was wrong with Dr. Stoddard's analysis. It's just like a weird system of deferring to an empty sack. The competitive entry exemption. I think there's been a... Burke fundamentally misunderstood the objection on this front. Burke defends the new entry exemption, the competitive entry exemption, on the grounds that it's not Burke's job to defend new entrants from themselves, from completing the market at a nonsensical price. But that really wasn't the objection that was brought to them. NRG made it very plain. Their problem was not with irrational exuberance in terms of punishing the people who make really bad bids. The problem was instead what it does that pollutes the market, how it hurts other people. That has always been the gravamen of NRG's very specific objection to this proposal. And while the analogy is not perfect, I'd analogize it, for example, to speeding laws. Yes, a purpose of speeding laws is to protect bad drivers against themselves. In some jurisdictions it may actually be a revenue-generating measure. But really what we're all supposed to think is that the purpose of speeding laws is really to protect us from irresponsible other drivers, as much at least as it is to protect them against themselves. And that's really why there needs to be some form of review. If we want to look at an example of how bad this could be, I'm pointing you only to things that we're able to actually find in the record here. The initial filing by one of the resources that we were specifically challenging here, the one in Maryland, came in at 13% of net cone, which caused PGM and the PJMIME both to say, well, that's just ludicrous. It has to be ratcheted up. So they make much of the fact they increased their amount by 400%. Well, that's fine if you're starting from 10% of net cone and you guys get into the 40s or you get into the 50s. But that's an irrational offer. And no one has any idea what's going on in the sausage factory that is the PJM and PJMIME analyses. Indeed, just to recall, the PJMIME, and this has never happened before, the PJM Independent Market Monitor filed a complaint against PJM during the auction because of their dispute over these very numbers. Ultimately, he withdrew it, saying, well, it looks like they would have been inframarginal anyway. There are important reasons why that is not sufficient. But there are, in fact, very significant problems with federal entry exemption. Finally, there's the reasoned decision-making problem with combined impact. Before I elucidate that point, FERC claims that we waived that, apparently because we didn't use the words of total effect in our headings or something, in our pleadings. But for all the reasons that are set forth in our reply brief at 24, we think it's very clear that we never waived this argument. We may have used other substitutes for total effect, like indelicate interplay among the various exemptions, but I think it's pretty clear what we were arguing. So, what is wrong with what FERC did here? Again, I don't think anyone can seriously dispute that what FERC told PJM to file was very different than what PJM actually filed. It's hard to even describe this as just the opposite, because it went all the way through 180 degrees and then added on some more here. So, it's like a 270-degree off directive. And there is no analysis at all of that combined rate, because it wasn't ever who was buying what. And FERC doesn't pretend that it ever actually analyzed this. And there was no, more importantly from a statutory perspective, back to the very beginning, no statutory opportunity for anyone to ever go after this. Well, I thought they said the unit-specific exemption was needed in part because the other two exemptions were alone going to have problems without also having the unit-specific exemption. Now, you may say that's ridiculous reasoning, but I thought that was their... I think I'm fairly representative, and they'll of course correct me. They say it yields benefits that warrant its retention. Again, as I said before, that's irrelevant under a 205 analysis. When PJM comes in with a 205 supported by all its stakeholders and has several pages of its filing devoted to the notion that the unit-specific review exemption is broken, we're not obligated to explain why it's just and reasonable to... We do not have to defend the just and reasonableness of something that we're getting rid of. But they said it was unjust and unreasonable, correct me if I'm wrong, without having the unit-specific exemption added. Yes, Your Honor. They clarified in their rehearing order. What we really meant to say was that it's not just and reasonable for you to remove this exemption. So we have to take that. And if that's true... I think if you accept their papering over of the standard, and I will point you to a specific language, which is reasons why I think that those paragraphs add nothing but more confusion. Specifically, after saying they weren't acting under FPA Section 206, okay, what's the next sentence? We cannot conclude based on the record before us that review of individual units, costs, and revenues is an unjust and unreasonable method of determining rates. That is straightforward 206 reasoning. So we're not acting under 206, but here we're going to tell you a 206 rationale. And it doesn't really matter. It is a statutory violation referred to as flipping around the burdens here. That is really a problem in and of itself. But it really doesn't matter because their decision-making here is so bad when we turn to what it is we're talking about, the individual review exemption. I think what they're saying is we have these two exemptions that PG&M proposes. And we, FERC, think it's unjust and unreasonable to have those two without the third. And why? Why was that? I know. But on the box... Hold on. But on the box checking of the analysis of how they have to go through the analysis, I think they did that. Now your burden, therefore, is to show, well, that's faulty reasoning that they should have actually accepted the two without adding the third and that it was arbitrary and capricious or unreasonable or something for them to insist on the third. Yep. And we believe we've done that because we think specifically there are significant holes in each of these exemptions. But to get back to this... It would be your position that they can't do that under an 05 as opposed to... That's what I'm trying to get. That was exactly what I was going to say, Your Honor. I want to get back to the statutory point, which is regardless of how you think FERC has or has not successfully papered over its burden-shifting mess here, we go back to what would happen in a 205 proceeding. Could PG&M have gotten this so-called compliance filing through the stakeholder process? No way. If they had filed this directly under FPA Section 205, what would have happened? Everybody, including people who support it now, would have come in as a protester. That's why it's so important to do what City of Winfield instructs and say, Look, if your rate is this wildly different, you are now compromising the right. You can't just acquiesce and walk away from it. You've now compromised the right of people to put in evidence before the fact about this particular rate, and it's before you make your decision. And your point on that is the re-hearing process is not sufficient to cure that, and that's your point there. It isn't, and I can talk about all the differences. FERC's reversal rate of itself on re-hearing is infinitesimally low. I don't know if you see it that way. We can't cure that, I don't think. So do ours. That's true. That's true. All right. I see that I'm well into my reply time, so unless there are further questions, I'll call it a day. Thank you. Thank you. Good morning. Carol Banta for the Commission. Starting with the last point, I'll start with the first order, not the re-hearing order. Paragraph 26 at JA680-81, also echoed at paragraph 141 of JA716. The Commission said these exemptions. Can you point me? I'm going to follow along with you. Where are you pointing this now? Okay. Well, I'll start with 26. It's sort of echoed in 141. We can go to that later. Paragraph 26? Yes. JA680. Okay. Where the Commission says we find your exemptions. They appropriately identify the entry you're trying to do. They do what you're trying to do. So we get to about halfway through the paragraph on that page, or actually by targeting. So first we're targeting the resources most likely to raise suppression concerns. That's a separate part of this order that limited the rule to gas. It excluded some other resources. Number two, adopting exemptions for competitive entry and self-supply and retaining the unit-specific process. Actually, I should jump to 141, because this is more of the total effect. The JNR finding, I'll jump ahead to 141, where we said this is not JNR, the exemptions. Standing alone. They are not JNR. We would not approve them under 205. Just and reasonable, right? I'm sorry, yes. You know, we get plenty enough acronyms and abbreviations. I won't add one. I won't go into J.D. Silberman on that. I've been told before, try to speak English. I'm very sorry. That's one that doesn't occur to me. It is an acronym. It is not just and reasonable, these exemptions. And it says why at the end of paragraph 141. There may be resources that have lower competitive costs than the default floor, and they should have an opportunity to show that they're coming in on a cost-based bid. Assume that is correct and it's not just and reasonable as the 205 filing begins. Can you, under 205 as opposed to 206, make this kind of a modification? I know you were going to say that they didn't make a modification. They gave them the option of complying, but that brings us to the City of Winfield Reserve question. Right. Doesn't this present the City of Winfield Reserve question? And if it does, how do you win under that? Well, I think we do win under Winfield, and I'll explain. What the commission said is these exemptions are great. They do what you want them to do. They could miss some, and that's where the risk of over-mitigation comes in. A resource that could actually show that its costs are lower than the default bid could be, as Judge Kavanaugh, as your question phrased it, forced to bid higher at the default bid without an opportunity to justify a lower cost. So what do we do about that? We say this is a flaw in the exemptions, and it's an over-mitigating flaw. What do we do about that? Well, the existing just and reasonable process that was previously approved is the unit-specific review. And, indeed, if we just rejected it flat out under 205, a very rigid reading of 205 that says if it's not just and reasonable, it's out, the status quo ante that we return to is unit-specific review for everyone, including the self-suppliers that could be able to come in under the exemption. And if FERC thinks that's not just and reasonable, FERC could then initiate a 206 proceeding? Yes, it could. And if there were a 206 proceeding, what would be the opportunity of the suppliers or anyone else, the stakeholders, to participate at that point? Well, if it were throwing out the existing process to start over, everyone could come in. But we're still – Yeah, well, do they have that same right when FERC makes this modification or whatever it made in a 205 proceeding? Or have they been finessed out of a right they would have had under 206? Well, they had lengthy requests for a rehearing that raised many of the same arguments they did on comments. So I don't think that this particular part of the order was expert-heavy or evidence-heavy. But PJM comes in with a filing of these exemptions it would like to do that streamline the process. Yeah, but you're looking only at PJM. I'm asking now about the raft of the stakeholders, whether this is – They're the ones – PJM is not who's objecting here. This is the stakeholders. But it's PJM's 205 filing. Yes, I know that. It's PJM's – right. We left that behind us. Yeah. And we're now saying, did they have the same right – stakeholders have the same rights to bring their differing position into the process at that point that they would have had had FERC initiated the same changes under 206? I think they did have the same opportunity. And if PJM did not want – What opportunity did they have beyond the rehearing application? Well, let's look at what PJM – No, no, no. Let's answer that question. No, I think the answer to that is what the commission said is what you've brought to us is not just unreasonable. You can either fix it or we throw it out. If we throw it out and go back to the status quo ante of unit-specific review for everyone, they start over. But if – I suppose if PJM – we said you have to have an opportunity to show your costs. I suppose if PJM wanted – Are you still talking about PJM or are you including the people who are complaining today? Well, if PJM wanted to do something different than its status quo ante, I think it probably would have to deal with its stakeholders in proposing something different. I think the reason it fits in City of Winfield is not just the consent because Winfield wasn't just about consent. Yes. And conversely, the flaw – the fatal flaw in Western Resources was not just – well, it may not have just been consent. The court did hint that perhaps consent would have made it okay. But in Winfield, the commission had set a different rate than the one the utility asked for, but using the existing methodology. So it wasn't drawn just out of thin air. Whereas in Western Resources, the court felt that it was. That the commission had not only rejected what the pipeline had come up with, it invented something completely new. Well, that's not what the commission did here. The commission said these exemptions leave a gap that is not just and reasonable. It is over-mitigating because it's not allowing someone to show their costs. Your existing process that we have previously found just and reasonable does exactly that. So fix your not just and reasonable filing by just filling in anyone that falls through those cracks. The vast majority of resources are going to fall in those. I didn't mean to interrupt. No, I took the end of the thought. Okay. To pick up on Judge Chantel's point, though, our decision in Winfield says that the process matters and the early notice matters that would come through the usual process rather than just the rehearing. And I think your burden is to tell us that actually there was no difference in effect in terms of the stakeholders' rights, the way it has transpired and the way it could have transpired as they proposed. Well, I think that the stakeholders' rights are only in peril if you believe that the commission has concocted something entirely new and radically different, and it has. It is approved. Well, it is new to put them all together this way. Well, it's not. I think that's not the way to look at it. You used to use this, and you're proposing these two, and so we're going to put all three together and say that's not new. But that is new to have all three together. I think the way to look at it is with the minimum offer price rule, anyone who is any new resource that comes in that is subject to the rule is measured against the benchmark, which is also the same number that's used for the default bid, the net cost of new entry. And you have to justify why you should be able to bid lower than that. In the past, everybody who wanted to bid under that had to justify it on a unit-specific basis showing their costs. Under the new exemptions, someone who wants to bid below that benchmark and to whom the rule is applicable, so only new resources, only et cetera, can prove that they fit an exemption. So you can almost view it as like a couple of safety nets that you can – well, I don't even know if that's the right metaphor, but you can justify why you should be under that rule this way. But there's a gap in them that lets someone who could show that they're cost-based fall between that. So rather than viewing it as three things that are creating some new rate, I look at it as more like a trapeze net, except it doesn't catch everyone. You have to make your case. Someone who doesn't make the two exemptions and falls through can still fall through entirely. So it really is hardly going to – it's only going to apply to the very small number, if any, of resources that don't qualify for the exemptions but can make a cost-based justification. And because this is all about cost-based bidding, the Commission said it's just not reasonable to categorically preclude someone from bidding at their costs and to force them to bid at a theoretical rate that we use as a benchmark without any opportunity to show that it should not apply to them. And this isn't something where you just skate by. You bring in your numbers to the market monitor, the independent market monitor, and PJAM, both of whom the Commission has – because they're independent players, the Commission has given them discretion as to a lot of these kinds of calls within the market. And I think this Court has recognized that, such as in the New England Power Generators case, that PJAM and the independent market monitor have a special role in this market. So you have to come in with all of the numbers that go into your cost-based bid, which include projections of energy market revenues, your land costs, your labor costs, all sorts of things, which may differ from the ones that go into the generic benchmark, which, you know, PJAM sets it as well as it can and it's a good number, but it's not written in stone. And if you have a resource where you could – and just to be clear, when you come in, you have to – you cannot come in and say this state subsidy factors into my costs. You have to come in and show the market monitor and PJAM that the costs you're factoring in are the ones legitimate under the tariff, not the state subsidies. And the bid you end up with isn't just a number you chose. It is a mitigated bid that was carefully analyzed by the market monitor with review from PJAM, and it is mitigation. It is a mitigated bid. It's just not the default offer bid or the default benchmark price. There may not be an answer to this, and it may not even be a proper question. I'm going to do it anyway. To what extent has it become a norm that FERC would condition approvals under 205 as opposed to 206? The argument here, as I understand it, is that this has been treated like a 206 because FERC is originating something in it. Right, and we disagree that it's originating. To what extent is it a norm that FERC would put conditions on the 205 approval? I think it's fairly common to put minor conditions. I mean, the Commission is very aware of the Winfield and the Western resources, and those actually get cited quite a bit. So I think it's very conscious of those bounds. But again, and looking to what the court recognized in Winfield, these aren't just, I want to raise my rate from $5 to $6. Again, going back to the capacity performance design, there were a ton of moving parts. Here, there are many parts to this. The Commission approved almost the entire filing. It said that the exemptions were not just unreasonable unless they were fixed, and it rejected the three-year mitigation outright. It approved everything else. And that includes, lest we characterize this as a one-sided deal, this includes things that the petitioners supported, like region-wide application instead of just in constrained areas, and also raising the benchmark to 100% of the net cost of new entry where it had been at 90%. The Commission approved nearly PJM's entire filing except for the outright rejection of one and the conditioning of another. Can you refer to that as minor? This one? In the sense that the Commission, first of all, it's on the archiving. Our cases use the phrase minor. Our cases use the phrase minor, and you said the norm is minor changes. Yes. In response to Judge Santel, would you call this minor? I would. Because the court cases talk about significant, materially different. Here we have a situation where the Commission was willing to approve the exemptions. There was a gap in them, and it happens that the gap can be filled by the existing. As we've said, we appreciate that minor deviations may be handled. Yes. And so I'm just probing whether this is really minor. I mean, we certainly wouldn't do this without consent, I think. This is one we were very clear about PJM's consent to it. And I keep coming back to the fact that we did not make up some new condition. It had been the existing just and reasonable continuing lawful tariff provision since the 2011 orders. In fact, I'm not sure that part was. I could be wrong. I don't think that part was even appealed in the massive Third Circuit case that dealt with so many other issues. There were some issues about the unit-specific review as it applied to self-supply, but the actual unit-specific review process, I don't remember that being appealed. And if it was, they affirmed everything that they didn't think was needed. So that is the existing status quo ante. So the Commission is not reaching into the air to find a number or to come up with a new process that it thinks would be great. It's actually looking at what you already had, which you used to have to do for anyone. Now you'll just have to do it if there's someone who falls through these cracks. And with consent, we do characterize that as not a significantly different or substantially different condition on the filing. And again, if we had rejected it, it would be unit-specific review for everybody. If the Court doesn't have questions about anything else, thank you. All right. Thank you. May it please the Court, Paul Flynn for PG&M International. PG&M got most of what it's wanting from these orders of the letter. We wanted to get these clear, transparent categorical exemptions and first approve them. We also asked that they eliminate unit-specific exemption because, in our view, it allowed us too much discretion and it wasn't transparent because it had to be confidential. But as a practical matter, from PG&M's perspective, since they gave us the categorical exemptions, that has greatly mitigated the relevance and need to rely on the unit-specific. So we were content, which is why we acquiesced. The alternative would have been to say, no, we don't want those categorical exemptions that we and our stakeholders labored to create for many months. We fought over every single word of those. And instead, we're going to go back to square one. We thought it much preferable to go ahead and get those two clear categorical exemptions into place and let them essentially occupy the field. And that's what happened. So as I hear petitioners, they are conceding that PG&M was the public utility and PG&M acquiesced. So what that leaves is their reading of City of Winfield. And as I read City of Winfield, what then Judge Scalia was saying was that this was a procedural issue, an issue of notice. The procedural concern, the concern to customers, strictly speaking, relates not to the power of the Commission to prescribe rates under Section 205, but to the procedures that it must employ in doing so. And it's an issue of notice. In this case, PG&M's initial filing said, we propose to eliminate the unit-specific exemption.  Well, that's not notice. That's not notice in the way he's describing it there, of having the two plus the one. That's starting from the premise that it had to be, that it had to be a package deal. And we can certainly argue, Commission, please approve this as a package deal. But in all my time doing this, there's never any guarantee that FERPA's going to say, yes, we give you 100 percent of what you want. That's simply not the way they operate. And other interveners certainly know that. But there is a risk. There is a risk that when we propose to eliminate something like unit-specific, that FERPA might not go along with it. And so there were protests of that. FERPA directed a deficiency letter to PG&M specifically on the issue of, why should we eliminate unit-specific? PG&M responded to that deficiency letter, and there was another round of comments and protests after that deficiency response, again, on this very question, should the unit-specific be eliminated? PG&M's argument was not that this was allowing below-cost offers. To the contrary, we were the ones administering this tariff, this unit-specific process, to ensure that offers did not go through unless they were based on reasonably expected costs and reasonably expected revenues solely from our market. And we were satisfied that we did that job. And so, as I would say, the unit-specific was there was ample notice. So the so-called reserve question, which I don't particularly see as a reserve question, because Judge Scalia does address whether or not there was notice in that case to customers. In fact, it was not a concern. But that's all it is. It's not a question of Section 205 authority. Well, he said we need not decide whether in some situations, for example, when the order imposes an entirely new rate scheme, this requirement can only be met if the utility's initial filing itself sets forth the basic scheme ultimately adopted. And it depends upon your perspective as to what is an entirely new rate scheme. Exactly. And so we can certainly ask the Commission, we all labored over this, if it means improvement as a package. But practically speaking, if you say we want to propose this subsection and this subsection and this subsection and this subsection as a practical matter, FERC is going to look at each one of those. And some it may grant, and some it may not. And that's pretty much the world we live in. Now, what Winfield and Western Resources say is that if FERC goes so far in denying what you've asked for, that it fundamentally changes what you've done, then the utility, the public utility, has the ability, because of the protections afforded by Section 205, to come in and seek to object to that. And certainly, if PJM had been unhappy with that, we could have come in and said, FERC, we seek regarding. You're violating Western Resources. You're violating Winfield. You can't do that, and you can't impose that on us, and don't put an end to our upcoming law. Had PJM been unhappy, we certainly could have done that. And that's what this case is all about. I just want to correct something in the reply brief. The petitioners, they say that we've overlooked references to alleged limits on our ability to file changes to the capacity market provisions here. Their statement is incorrect. They're referring to a limit on our ability to change the operating agreement, which is not an issue here, and limits on PJM's ability to change something called regional rate design, which is for transmission service. This case was not about transmission service. It was about the capacity market, sales, generators, and demand. Competitor entry, the speeding ticket analogy, is a little bit off. I won't allow it to be a little bit off. Because what we're talking about is folks bidding low. And so the concern is, oh, my gosh, you're bidding too low. Bidding too low is only a concern when it's done, there's reason to believe it's being done to manipulate the market. And if someone makes a poor guess as to their cost, they guess low on their cost or they guess high on their other revenues and say, oh, okay, I'm going to submit this bid. I'm going to clear that market. What they're going to find out is they're not making enough money to stay in business. Again, this is someone that doesn't have a subsidy. They don't have the out-of-market revenues to make up the difference. They're going to pay the price for that. They won't be able to stay in business. Now, it can be that when they do that, that harms other sellers. But guess what? That's what happens in a competitive market. Not every seller is a genius and guesses exactly right as to their cost in a competitive market. So that's not really a speeding ticket type of situation. If there are no other questions, I'm done. Thank you. A couple minutes. You do not have any time remaining, but we'll give you two minutes of rebuttal time. I will be very brief. First, to answer your question, Judge Sintel, no, I don't think it is the norm. Since the briefing of this case started, FERC has been inserting comments into numerous orders telling people, hey, by the way, in case you're not clear, you do have the ability to walk away from this condition. If you want to have this filed via 28J, I'll just put up telling you that this has actually changed the train there. Next, to clear up another thing, yes, the problems of the incident review were, in fact, litigated in NGVPU, although we had to withdraw a large portion of our side of the case in the NGVPU proceeding because we had a settlement here in 2013. While that case was being litigated, it took away a bunch of our issues. That's one reason why we keep describing it as a settlement. It was a stakeholder settlement of ongoing litigation in the Third Circuit. It wasn't just some random deal that we were deciding to pursue. Let's now turn to where I think everyone is now focused. The real gravamen of this case has become how violent was the change that FERC imposed? Does it meet or not meet the standard under Winfield? Judge Kavanaugh, I don't think that you're going far enough when you say, well, 2 plus 1 is different than 2 instead of 1, right? 1 plus 1 equals 2, or 1 plus 1 plus 2. These are all different. There's another thing. It's the back half of our briefing. Sadly, we didn't have time in the opening to discuss the 1 versus 3 years of review, which is very important because the units that got through here decided between the order and rehearing that they weren't going to proceed, at least not immediately, with construction, which kind of does a lot of damage to the construction cost or sunk cost if you're not actually incurring those costs. I don't want to ambush anyone by bringing up this entirely. Please, we'll rest in the briefs. Please review those. Your point is that when you add that into the mix, that's more intense. It's 2 plus 1 plus 2 plus 1. It's not fair for FERC to say, oh, we improved the vast majority of what they filed, except its purpose, which was to replace all the stuff that they told us to retain. So that just doesn't make sense. The other thread of FERC's argument, and then PJM's, is, well, you know, it's a very small exemption. It's just meant to catch these other fish that don't make it through it. This exemption, this application of the exemption, allowed through resources that cost the market $3 billion that resulted in God knows what legal fee is taking all the way through two preemption trials in two different district courts, two courts of appeals, and all the way to the Supreme Court. This was enormously damaging stuff that made it through. What's the this when you say this was enormously damaging? It was enormously damaging that the failure of the unit-specific review, this opaque unit-specific review process, was enormously damaging to the market and had to be dealt with through completely collateral proceedings. It was a huge error. It was a world-changing error. We just had two days' worth of open technical conference meetings at FERC last week to discuss the way the markets are falling apart as a result of these things. This is a very, very- As a result of these things, sorry to ask. As a result of the failure of the MOPR system to catch below-cost entry. Now to Mr. Flynn's point. He says the only purpose, the only real problem with below-cost entry is when they mean to do it. That is not what this Court's decision in New England Power Generator says. Your Honor, Judge Sintel, what did you say there? No. It embraces, it doesn't really matter whether it's intent as long as the prices are artificially depressed. And you described it as definitional market distortion in favor of buyers. So it is, in fact, a big deal regardless of intent. And if the speeding analogy was not apt, I apologize. But I think you see the direction that I'm going. It's the damage that third parties were worried about, not stupid mistakes that people make about their inability to recover their own costs, particularly in situations where they do that. Yes, Your Honor. A couple of process questions. One is I think I understood PJM to say that Winfield and Western Resources both give ability of the utility itself to argue about whether FERC is changing this drastically. But does that apply to stakeholders? That I think is the whole point of the reserve question in Winfield. Because it's saying, look, it's okay for FERC to mess around and impose conditions if the utility acquiesces. But then they have a whole long paragraph saying, but there's another really important concern here. If the change is really dramatic, then we need to allow the third parties the opportunity to notice and comment. And importantly, this is why re-hearing is not good enough, we have to have notice and comment before FERC makes a decision. Before. And it's very clear in the decision that that's important. We know agencies get dug in once they do this. One other question. Yes, Your Honor. Which is, as I understand it, if this had been presented to FERC as a settlement, then presumably it would have been all or nothing, right? It was, in fact, presented to them as a settlement. Well, that's my question. They describe it as a compromise between the stakeholders, but they don't call it a settlement. We think of it as a settlement, largely because we know we're settling matters that were before the Third Circuit. It was presented to FERC. I guess my question is, is there a difference? In other words, if this had been the result of litigation where everybody signed off on it. Because it was a settlement of something different. Here, though, is what sustaining FERC's orders will absolutely cause, in addition to a future suit about cleaning up the governance procedures at PJM, which is not before this court now. But what this case is going to force us to do in the future is, if we want to do something, we're going to have to do like we did in the NJBPU case, file a 206. And after we file the 206, we will then get together and settle our 206 complaint. And that will bring us on the trailblazer and all the other things where we're looking at settlement of FERC litigation, not settlement of appellate court litigation through a stakeholder process. It's more narrowly. We do need to be clear about which kind of settlement we're talking about. It's an excellent question. I hope I've cleared it up for you. I need to understand, and I'm sorry to belabor this, I need to understand why the rehearing isn't good enough. And for you to break that down into bite-size pieces, if you can. The first reason is because, as the court explains in Winfield, and the citation of Ruckelshaus explains, it's not just an FPA issue, it's also an APA issue. The important thing about noticing comment is that it occurs before the agency makes the decision. Right. I completely get that. Now, what practical difference in a case like this, what could have transpired differently? If it's a 205, we get a stakeholder process beforehand. PG&M, of course, says now we don't really have to care about what you say. We'll follow what we want to anyway. But at least get the opportunity to develop our evidence, dialogue with one another. And the purpose of that would be to convince? It would be to amass our evidence, maybe get the decision, maybe get the 205 filing more narrowly the way that we want it so we can avoid conflict. We also then, once the 205 filing is made, we have 60 days to fight about it, not 30 days to fight about it. Fight? So we have a 60-day notice period under 205. It's a 30-day mandatory rehearing requirement. Of course, it applies to us. It's also supposed to be one for FERC, but FERC has tolling orders, and so we don't get orders late. Is part of your theory that you'd be able to convince PG&M to do something differently? Yeah, but we don't stand a hope of being able to get a 205 filing that's going to get Lode to sign on, the other half of the market, because they got what they want. They got their self-supply exemption, so that side of the market, they're sitting free. We, on the other hand, as the merchant generators, where are we supposed to get those votes? But interestingly, if you put in this proposal in the stakeholder process, it would have failed, and if it had been filed under 205, it would have protested. So the procedure really does matter here. We want to go back to square one, and strangely, FERC seems to think this is the solution. It would have failed. I'm sorry to prolong it, but you say it would have failed. Explain that. Oh, I'm sorry. I shouldn't have said failed. There would have been rampant protest if they had tried to file this combined proposal. Right. No one to three. You're going to keep the units separate. But what does PJM do with that, given that they know that the only way to get it through the commission is to keep the three together or go back with what they had before? Then they may file nothing, in which case we'll file a 206. And if we fail to achieve some sort of stakeholder consensus, if this goes back, we will, in fact, file a 206, and we'll try to get this fixed. And not just this fixed, but this fixed in the context of all the other things that have occurred over the last four years to make this make some sense. We've got Supreme Court cases to weld into this. We've got capacity performance to weld into this. There's much to do. But we on the generator side aren't going to be able to do a damn thing about unit specific review unless we get some of our bargaining power back. We need that back. So please send this back to square one, and let's build something that works from the ground up in a 205 proceeding with appropriate evidence. That's what we need. All right. Thank you. Thank you. The case will be submitted.
judges: Brown, Kavanaugh, Sentelle